This obviously is a matter long postponed and continued of Lark v. Beard. We also mentioned at the outset, I realized earlier this week we only allotted 15 minutes, which is unusual for a capital case. The Sword of Damocles is not going to decapitate anyone when the red light comes on. So, obviously, it's a very crucial and important case, as they all are. So, I mean, you're not going to be... Assuming that our discussion is productive, you won't be rushed. So, when the bright light comes on or when the yellow light comes on, don't panic. We should have given this more than 15 minutes, especially given some of the preliminary default issues that have to be discussed. I'm sorry, I always mispronounce your name. Is it Dolginos? I know what it is, and I can't... Dolginos, Your Honor. I'm sorry, okay. Good morning. Tom Dolginos from the District Attorney's Office of Philadelphia for the Commonwealth Appellants. I'd like to reserve three minutes for rebuttal. Okay. Robert Lark was found guilty in 1995 of murdering a man named Tai Bong Cho to prevent Mr. Cho from testifying against him in an armed robbery case. And as Lark tried to evade police, he kidnapped a woman and her young family. We really do know the facts, and you're an old hand at this. So, why don't you just get into your legal arguments? Let us know why you think there's a default here and what the district court did that was wrong. Well, Your Honor, there are a lot of moving parts here. Why don't I start by saying what the district court did here was incorrect. Essentially, what the district court said was that the prosecutor's inability to articulate a race-neutral reason for three of his strikes some 20 years after the trial was itself mandated a new trial. Why doesn't the inquiry stop at the second stage if, in fact, the prosecutor is unable to articulate credible reasons? Well, the three-step process, Your Honor, is a means of presenting evidence. It is not meant as a procedural trap. And the Supreme Court has been very clear in Johnson v. California, which I cited in our brief, that the inability to even articulate any race-neutral reason at step two does not end the process. The burden never shifts from the person making a Batson claim. And if the prosecutor or whoever the challenged lawyer may be can't articulate a reason, even while trial is happening, all that is is evidence of discrimination. It does not carry the petitioner's burden or the claimant's burden. Even if you're right and you argue totality of the circumstances should be looked at, and we said the same thing, if we don't stop with just his inability to recall 20 years after the fact, which is understandable, add to that the incredible, at least to my mind is significant, that he exercised the 15 strikes that he exercised. Twelve of them were exercised against blacks. You've got this remark that he makes, which you characterize as sarcasm, and I've been trying to search my mind to find out how, even assuming it's sarcasm, it could be neutralized, and that is when Rogers got up and said he's striking all the blacks and Carpenter says, oh, how awful. So you take the how awful comment, and obviously this is in context with the time, so it's not quite as damning as it would sound in retrospect, but you take how awful. You've got 12 of 15 strikes being exercised against blacks, and then you've got the DA not being able to recall any race-neutral justification for striking three of them. You put all that together as you suggest we should. I understand you're not arguing we should just put that in the pot, but if you look at the totality of the circumstances, those are the circumstances. To add them all up, how can the defendant not sustain the burden? Because, for various reasons, Your Honor. Number one, the record shows that Mr. Carpenter accepted at least four and probably five African-American jurors, four of whom sat and heard this case. The record also shows that Mr. Carpenter accepted about 25% of the African-American veneer persons who he had the opportunity to accept or reject. That's a number that is similar to what this Court faced in Abu Jamal. Granted, the strike rate looked on as its own could raise an inference of discrimination, but we're well past that. I mean, at this point, the only thing left is whether or not you can say, or the petitioner can carry his burden of demonstrating that more likely than not, any particular strike was the product of discrimination. Well, given that, the fact that he accepted the number of blacks that he did, accepted four, possibly five, as we were saying, the test is, for a Batson claim, you only have to show that Batson applies as to one racially motivated strike. And the fact that you've got, and I don't, obviously none of us know what the panel looked like, and may have been given the limitations on our peremptories, and this is a Philadelphia jury, and we've all, well, most of us have seen what the panels look like when they come into a court in Philadelphia. It may have been impossible for him to strike everybody, even had he wanted to. That's conjectural, but I say that only to suggest the fact that he accepted four blacks out of 12 doesn't seem to mean much when he struck 12 of 15. Well, Your Honor, a couple of things. First of all, the idea that he could have, that he, the possibility that he intended to strike all blacks, but was unable to do so, is just simply belied by the record. I'm not suggesting that, because he had more strikes left. Yeah, he had five more. Okay. And several of the strikes that, you know, that are at issue were at the very beginning of the process. I mean, it's just, that's number one. Number two, I don't disagree with you, and we've had this discussion before in other cases that I don't think I've been very clear. I don't disagree with you that all it takes is one strike. But the question is, how do you prove discrimination even with respect to one strike? And the idea, the idea that who the prosecutor accepts is not relevant, is just, it flies in the face of common sense. So what do you want us to do, Mr. Cooper? In other words, you're the appellant here, and you obviously want us to remand this case. And what, if you were to, what do you think we should do, what are the district court to do on the remand? Well, Your Honor, a couple of things. I think, first of all, that the claim, even as presented, fails for a number of reasons right now. There is the default argument that I'm not going to go into here. If there's enough in the record right now to say that the Paxson challenge fails, and we really, I think there are other issues that were raised, not Paxson issues, what would we do on district remand for their consideration? Well, I think there are threshold issues, Your Honor. Number one, the district court should never have held a hearing in the first place because of a lack of contemporaneous objection and the failure to develop a record in state court. And I think it's appropriate for this court to direct the district court to dismiss the petition because it was not appropriate for the record to be developed any further in federal court. If this court chooses not to do that and holds, as I think it has to, to go any further, I think this court has to hold that it was appropriate to hold an evidentiary hearing in federal court, even despite the lack of a full record. If we get to that point. Was it appropriate or inappropriate? I think this court would have to hold. I'm saying as a matter of logic. I'm disagreeing, but I think this court would have to hold that the failure to make an objection, the lack of a contemporaneous record or a record developed in state court, doesn't matter, a hearing was still okay. Well, just assume that we hold that. Now, where do you go from there? What would you want us, what would you have us do if we make that threshold holding? Well, at the very least, Your Honor, I think the case should be remanded with instructions that, you know, it's not appropriate to stop the inquiry at step two of the Batson test, that Batson's instructions at all relevant circumstances have to be taken into consideration, work for the party, not simply for the party making the claim, but the party defending the claim. And that is so that the district court would have to take into account not only the reasons and the testimony of Mr. Carpenter, but the other reasons apparent on the record for these strikes, as well as the fact that Mr. Carpenter accepted four and probably five African-Americans. And all of that should be assessed with the understanding or under the overarching principle that the petitioner, Mr. Lark, always carries the burden. And if there's a difficulty with the passage of time in a case like this, it's necessary for him to overcome that. Would it be proper for the Court of Appeals to make that assessment of the third stage? Yes, I do, I believe so. But as a part of... You're arguing against a remand. Yes, I am. I'm saying that if we were to remand, if this Court were to find that it was appropriate to hold an evidentiary hearing, I guess I skipped a step. My first step would be that this Court could look at the record and say, as a matter of law, this isn't enough to overturn a 26-year-old trial. Could we say as a matter of law that we could affirm? What the district court did? Yes. Well, I think you cannot because of what... I'm sorry, you mean come independently to the same conclusion? Yes. Do a step three analysis ourselves but reach the contrary result to the one you had before. That would be very unusual because, as Your Honors know, usually bets and claims are decided by trial courts. In a case like this where... You suggested that we could decide it, but you wanted to decide it your way, obviously. Yes, exactly, but that's because I think it's, as a matter of logic, it's kind of easier to see how a petitioner wouldn't be able to carry his burden at this stage rather than how, as a matter of law, we could not disprove discrimination at this point. I think that's a tougher burden for him than for me. As a matter of logic, you could do that. I don't think it's justified. When the Supreme Court determined that Batson would be applied to cases in direct appeal, it was necessarily determining that the prosecutor would be in a position to have to go back where they weren't really keeping records because under Swain they probably didn't have to so that they were necessarily requiring reconstruction of the memory. In this case, though, it was really quite extreme. Does that factor in? I say this because in my own experience, I was an appellate division judge in New Jersey and the opinions were peculiar. Sometimes I could look at a peculiar opinion, they all looked the same when I was on it, and I couldn't remember if I had read it. That was less than 20 years. So, I mean, the memory is not perfect after 20 years. I think Your Honor is exactly right that these cases are difficult, and the way the retroactivity law works, I think we're going to have difficult cases like this. This Court has experienced them before. The problem is that Batson had not been decided at the time of trial. Batson came down while the judgment still wasn't final because it was on direct appeal. So in all of these cases we have to go back and do the best we can to reconstruct. I think what we have to come away from that with is a respect that the passage of time is going to make things more difficult, and that's even more reason to apply the general Batson principle that all circumstances, objective and subjective, have to be taken into account. Because at this point applying, and I've made this argument in this brief and in other briefs, the three-step process shouldn't even really apply in cases like this because it's a means of presenting evidence. And at this point we really should just be arguing about whether or not on the record as it stands, the petitioner is able to carry his burden. Let's assume that we think that the matter should go back. What are the factors that the district court should consider that the district court did not consider in the two-step in making his determination at the end of Stage 2? Well, Your Honor, as I read the district court's opinion, I don't think the court actually considered anything, any fact, in reaching its ultimate decision. There were a number of findings of fact, but I think they did not lead to the final decision, which the district court simply said there's no articulation of a race-neutral reason, therefore you lose. So I think almost the entire factual record is now up for review. What are the points that you would emphasize? Well, as I was saying before, that, you know, number one, that there are race-neutral reasons apparent in the record, both testified to by Mr. Carpenter and, you know, independently of that. Mr. Carpenter's acceptance of four or five African-American jurors, his far less suspicious exclusion rate, which this court held in Abu-Jamal, was relevant. I should also say, though, that with respect to the lack of contemporaneous objection and the lack of an adequate record, especially the contemporaneous objection. There was an objection. No, well, I mean, that's one of the points of argument, Your Honor. Basically, it was, from our point of view, it wasn't an objection at all. It was simply a request for records. But what more could he have done? He couldn't say, Your Honor, I suspect that in a few years the Supreme Court will decide a case coming out of Kentucky. Maybe it will involve a guy named Batson. Therefore, I want to specifically object to the manner in which the preemptory challenges are being exercised. At the time the trial occurred, the DA could exercise preemptory challenges based upon a racial motive as long as the entire panel wasn't precluded under the frame. And that's basically what Rogers suggested. He said that the DA was striking all blacks, which was the language he had used under the frame. He clearly suggested that he was concerned that there was a discriminatory motive driving the exercise of preemptories. What more could he possibly have done at the time? Well, in all the cases, Batson, Griffith, Hardcastle, that objection was made. This isn't an ineffectiveness claim. The idea is the one thing in addition to retroactivity that prevents new claims from being made is the requirement that an objection be made, that the record be preserved. To take advantage of new law, it's a settled principle that you still have to make an objection. Sometimes, you know. So you're saying he didn't say the magic word object. He said, I think the prosecutor is exercising his challenges in a discriminatory manner. He didn't specifically say, and therefore, I object. No, it's not at all a magic words thing. First of all, number one, the only thing, only time he raised any kind of problem at all was with respect to four jurors. He said specifically, I'm not saying what happened yesterday was, and he never raised it again. And his discussion of it, and I'll read it, he says, can we have the names from the last panel preserved and I'll do whatever I have to do to determine what sex, what race they are. I'm asking you to give some aid in preserving the records in this courtroom so I can make a challenge if I find that to be the case. He did not make the challenge. I'm not faulting him for it, but Batson requires a contemporaneous objection. But what else did he say when the DA said how awful? When he said you're striking all blacks. Now, Chief Judge McKee, you have to read, as I'm sure you have, you have to read the transcript in this case. These two lawyers were so sarcastic to each other, and we went into this at the evidentiary hearing below. You know, at one point, Mr. Rogers, now Judge Rogers, said to Mr. Carpenter, John, you're not as stupid as you look. At another time, Mr. Carpenter said, when Mr. Rogers said, I'm going to be looking at what you do with respect, I think it was to the Batson, or to this thing, he said, oh, I'm scared to death. Actually, no, it wasn't. It wasn't the Batson.  He said, oh, I'm scared to death. The two of them, you know, it's not, they didn't cover themselves with honor with respect to their sarcasm, and Mr. Carpenter testified about that. But he clearly was not admitting that he had struck all blacks because he hadn't. The only thing that was said at that point was that, I'm not saying before, Your Honor, this is what Mr. Rogers said. I'm saying those last four. And that's essentially when, it was actually before that, that Mr. Carpenter said, oh, how awful. But in a sense, I mean, isn't that treason? Because under Batson, he'd only have to show those four, or one of those four. It seems like Rogers is saying, look, yesterday, I don't have any problems with the way Carpenter exercises peremptories, but these four, or at Cisco, and I can't remember the names of the other ones, Samson, Williams, as to these four or three, I think he's exercising his rights in a discriminatory manner, which is exactly what Batson would suggest he had to do. He didn't say I object. Well, assuming that he was actually objecting to those four as opposed to saying let me see the records and I'll object some other time, you're correct, except in that that would take out of the equation the jurors to whom he didn't object. Now, remember, of the three jurors that the district court granted relief on, two of them were not in those group of four, only one, Mr. Cisco. So, you know, even if your Honor is correct, and this was an actual objection that asked the district court to do something other than preserve records, which no one really, I don't even know what it means. Mr. Carpenter said, well, that's what the stenographer is for, and that was sort of the end of it. If you're correct that it was an actual objection, it would only be one of those four, Mr. Cisco. And there are reasons in the record even with respect to him. Mr. Carpenter, when he was on the stand, couldn't articulate a race neutral reason, but in our brief we discussed that briefly. My concern with that in your discussion is apropos when you talk about Carpenter's general approach to strikes, and he said that he's concerned about one of them was the age. One of them had two young kids, I guess 15 and 17. One of them lived too close to the crime scene. The problem with that is I think one of them had a background in mental health, and he's concerned about that, which is understandable. The problem with that is, and this is what the cases all suggest with Batson, what you have to do is go through the record without the voir dire to make sure that there were no white jurors with similar kinds of troubling, in terms of Mr. Carpenter's perspective, troubling kinds of attributes who were allowed to sit. For example, we don't know whether or not there was a white juror who lived as close to the crime scene as one of the black jurors, or one of the white jurors may have had a similar kind of social service, mental health background or young kids that was allowed to sit. And without having that calculus, you really can't get a handle on it, and therefore I'm not sure that it helps that much to say that there were reasons on the record for allowing the strikes as to some of the blacks that he was arguing about. Well, I would disagree with you, Chief Judge McKee, in that the court is obligated to do these juror comparison type things, where in fact, as I see it, and we made this argument, where those types of comparisons were not made in state court. In fact, I think the federal court is precluded from doing that, and I cite a number of cases in Snyder versus Louisiana from the U.S. Supreme Court. It's true that the court did some comparisons there and has in other cases, but the court warned that comparisons may be very misleading, and it allowed itself to make the comparison only because specifically the state Supreme Court had itself made a comparison, and the characteristic was thoroughly explored by the trial court. The problem is, and this is something that is... In fact, it's a false argument. But he did ask for a hearing before the PCRA court, and that was denied. Correct, but for a couple of reasons, obviously, I think that leads to a default rather than a windfall, A. And B, the rule didn't prevent them from making a more sufficient proffer. I mean, the proffer that they actually made to the PCRA court is, we believe that at least 10 African Americans were struck by the prosecutor, A. And B, there were three African Americans on the jury. We didn't hear anything about the other jurors who the prosecutor rejected or accepted, and the number three was actually wrong. If diligence or default mean something significant, it would mean that at that point it's not the rule that prevented them from making a proffer. It was, you know, a lack of investigation. I'm not faulting them for not doing that, but sending out an investigator as they did before they went to federal court is something they could have done. I also want to say really briefly about the comparison thing, and this is something that's common to all equal protection cases, that if you mean to prove discrimination through the use of comparisons, whether it's two people at a workplace under Title VII or anything else, there's a requirement that they be similarly situated beyond the one characteristic. Now, what we have here is this is just one example from this case that, you know, one thing that Mr. Carpenter said was that young people he kind of viewed with some suspicion as compared to older people. The older I get, the wiser that seems. You know, I might have argued with you a few years ago. Maybe that means something, too. So you have two young people, one who was struck and the other was not struck. Now, you can say that the difference between the two was race, but you could also say that the difference between the two was that one of them had a father-in-law who was a cop. That's not similarly situated. As a matter of equal protection law, that's not proof. So, in other words, comparisons can be made when they've been timely raised. They can be made when they're carefully made. But on this record, having these arguments not having been raised in state court and the lack of sort of a similarly situated analysis here, that's one thing, by the way, that if you did remand to the court an instruction of that kind, in other words, to be careful about the juror comparisons you make, that might be helpful. Is the record adequate now to get into those kinds of comparisons? Honestly, I don't know what else we could do. We have the voir dire. We have Mr. Carpenter's discussion. We could argue from the record. We already did argue from the record, frankly. I'm not sure what else is missing, but that would be up to the district court. But I don't think we need, even if I lose on everything else, I don't think another hearing, I'm not sure what it would accomplish. Okay. Mr. Jonas, thank you very much. But you would just remand it for the judge to look at what he has but consider it as a third stage case.  Again, if we, the appellants, lost on every other ground and got to that point, Judge Greenberg, I would agree that that is sort of where we need to go. I mean, I would say that it's not a stage three case. It's simply a stages-out-the-window case that now you just decide discrimination. The three-step process at this point is only confusing things. Now we just have to decide whether the petitioner has met his burden, considering all the evidence, not some of the evidence, and not basing the decision on whether a burden of production has been met or not. But, again, that's if I lose everything else. You know, there is a case, actually, and I know because I wrote the opinion years ago for the Virgin Islands, where before Batson, there was a case being tried there, and an attorney from Philadelphia advised an attorney in the Virgin Islands about Batson and told him to preserve the objections if there was race strikes. And the attorney didn't do it, and I think we said that that was a basis for an ineffective assistance to counsel case, even though Batson wasn't the lawyer, and there were unusual facts there. So some people did know that Batson was coming, and they took steps for it. There's no question about it. Absolutely, Your Honor. I know that. I remember the case well. It's published. Thank you. All right. Thank you.  Good morning, Your Honors. Stuart Lev for Mr. Lark. Let me figure out where the best place to start. Let's start with the question of remand. If you believe that Judge Padova was erroneous in the way he reached his decision, reached his conclusion in this case, then I agree that the proper remedy is to remand back to him to make a more comprehensive determination. But I don't think that's necessary, and I don't think Judge Padova was wrong. Judge Padova recognized, when you read his opinion, that step two of Batson, the giving of reasons, was simply a burden of production. He said that. He recognized that the burden of proof of discrimination never shifted from the defendant, and that throughout it the defendant had the burden to prove discrimination. He said that. And so when he got to step two, and Mr. Carpenter was unable to give reasons as the three jurors, and the law is very clear. Johnson versus California says that the failure, the inability to give reasons to state reasons, is itself evidence of discrimination. Yeah, but wouldn't you have to view the reasons he gave after all that time rather generously? I mean, rather than, you know, with a lot of certain. In other words, it's so hard in real life to remember something like that, that he gave the best reasons he could, and wouldn't the reasons to stop at step two in themselves have to show an equal protection violation? And if you don't know why you did it, then it doesn't show that. And I don't disagree with that, Judge Greenberg. I think there's a lot of truth in what you say, that you have to give him leeway because of the time, just as I think the time cuts both ways. It's harder for the defense to reconstruct. He didn't give an answer that would have showed an equal protection violation. For example, he didn't say, look, there were already three blacks on the jurors, and I thought that was enough. Now that would be a reason that on the face would be a violation, and therefore you could grant relief. But he didn't give any reason that in itself was an equal protection violation. Well, I'll get to the second part of that in a second. I think you're correct that by itself, the failure to state reasons does not automatically give you bats in relief. But I think you take that failure and the weight that you give it, in light of the time that's passed, and you weigh it as another factor in light of what else was already before, Judge Padova. We have the strike rate of Judge McKee, at the risk of being picky, was 13 out of 15. Not that that matters. 13 out of 15 peremptory strikes used. What did I say? 12. Not that it matters. Used against African-American jurors. That's a strike rate of 86 percent against African-American jurors, compared to striking only two, using two as 15 strikes against Caucasian jurors. That's a rate against Caucasian jurors of, I think, 13 percent. Over 6.7 times more likely to strike African-American jurors. If you look at his acceptance rates, he accepted four of 17 African-American jurors. Only 23 percent. Although he made choices, he had 29 jurors who he could accept or reject, 17 of whom were black. So only four of the 17 he accepted. But he accepted 10 of 12 of the white jurors who were before him. That's an acceptance rate of 75 or 80 percent. So his acceptance rate is more than three and a half times favoring Caucasian jurors than it is African-American. The initial panel, 17 of the 29 were black? 17 of the 29 that he had the chance to accept or reject were black. For a death case only brought in 29? I guess it only got to 29. Well, there were 45 jurors after cause in the panel, and he made decisions on 29 of the jurors. So you have a very high strike rate against African-Americans, a very low acceptance rate, a very high acceptance rate of white people. You have Mr. Carpenter, and let's take the sarcastic, oh, how awful, we can take the sarcasm out of it. He doesn't deny that he's using strikes to strike some black people. He does deny that he's systematically trying to strike all black people. He says that there are some on the jury. But he's focused on that. When was that statement made? That was during the whole discussion between Mr. Rogers and the judge and Mr. Carpenter, where I think it's page 616 of the appendix, around there. That discussion goes on from like page 611 to 616. Where he says, I'm not systematically striking. I have three on. That should answer the question. So he doesn't deny that he's using individual strikes against black jurors, as he was allowed to do at the time. The Pennsylvania law under Commonwealth v. Henderson allowed him to do. So Judge Padova has all of that information, plus his failure to be able to give reasons for three of the jurors. And he says that's enough to prove the burden of discrimination and to prove a Batson violation. That's sufficient for you to affirm without having to remand for the comparative kind of analysis, and possibly for the introduction of other evidence. There was evidence we wanted to introduce before Judge Padova below. We wanted to introduce the McMahon tape, and we wanted to introduce a statistical analysis of strikes to show the relationship between what Mr. Carpenter was doing and the McMahon tape. Judge Padova never ruled on those questions, because he felt he didn't have to. He had enough based on the record that was before him to make that decision. Excuse me. Does the record reveal anything other than the race or sex of the jurors? Any other characteristics? Yes, it does. The record we made at the hearing before Judge Padova does, and what it shows. And the record that – and what it – because what Mr. Carpenter did is he didn't have a recollection of the particular jurors, but he went through the notes of testimony. He went through his personal notes, and he tried to reconstruct what factors might have led him to strike certain jurors. And – but what we see in that – what we see in that is that the factors that led him to strike African-American jurors weren't applied to Caucasian jurors. That's my question. Does the record – I want to ask if the record shows that, because you and Mr. Douglas may not agree on that. But is the information to reach that conclusion there in the transcript? There is information, yes. Is it information, or is it absence of information? No, it's information. It was from the testimony from Mr. Carpenter at the hearing. I think there's information. Let me give you one example. You said – you mentioned in the tape, was Mr. Carpenter present when he made that talk? No, no. Mr. Carpenter was older than Mr. McMahon. He was senior to Mr. McMahon. Mr. Carpenter was not one of the people being trained. And I think that's one of the reasons why Judge Padova didn't rely on or use the McMahon tape. And we're certainly not relying on it now. But I would point out one very interesting thing, Judge Greenberg, that strikes me about the McMahon tape. When McMahon is training the young district attorneys, he tells them that these aren't rules and these aren't ideas that he made up himself. He says that they came from the wisdom of the office, what was passed down through conversation with older attorneys. Mr. Carpenter testified to the very similar things at the evidentiary hearing. Mr. Carpenter said he wasn't trained in how to pick juries, but he learned through the folklore of the office, the stories and the ideas that were passed down. So a lot – and when you look at the McMahon tape and what Carpenter did, there are an awful lot of similarities in the reasons they gave and explained it. But the McMahon tape is really not part of this. There was no culture. The McMahon tape did not establish a culture within the DA's office. I'm sorry. In bond, we've already held. You've already held that. And that's what I'm saying. Judge Padova didn't rely on the McMahon tape. It's really not a part of this case and this appeal at this time. It's something that could be considered for whatever weight it's worth if we go back to Judge Padova, but it's not anything that I'm suggesting to you here. But I did want to go back to the comparisons because my friend, Mr. Dolginus, mentioned, you know, that he said he didn't have, like, young people, but there was a young person who he rejected and a young person he accepted, but the young person he accepted had a father-in-law who was a police officer. There was a young black woman named Lisa Patton who lived at home with her parents, was a full-time student at Emory University, was working while she was home for the summer, had an uncle who was a retired police captain, and had another uncle who was an active police lieutenant. She was an African-American juror. So there's a juror with the same characteristics. Lisa Patton was struck. That's exactly why Mr. Dolginus has cautioned us about making those kinds of comparisons. If you go back to the lure of the McMahon tape, one of the things he says is, you don't want smart people on the jury. So the fact that she was a student at Emory, unless we could get into whether or not the other person in a similar situation also were students at the time, it was already dissimilar. Except he took the young white juror, the young white woman, who was working part-time and going to college, I think, at Villanova. So again, when you look over and over again, he says he was concerned about women with children around Lark's age, because they might be more sympathetic to the defendant. And yet it was only African-American women with children around Lark's age, or with unknown age children, who he struck. And white women with children around Lark's age, he accepted. He was concerned, he wanted people who had jobs and stability in the community. And yet there was a juror, Alwina Green, who worked for the federal government. Her husband worked for the federal government. Ms. Green was going to school two nights a week at St. Joe's. They owned their own house. They were stable members of the community. And yet she was struck. And similarly situated Caucasian people were not. Mr. Dulgeness says you have to be careful about the comparisons. But Miller L, I think it's Miller L2, the second one, recognizes that you're not going to get identical jurors. You're not going to get jurors whose all their factions complete. But the comparisons are useful when you see a pattern of reasons that are being applied to African-American jurors that aren't being applied to Caucasian jurors. And that, what was going on over and over in any number of reasons, and they're listed in more detail in our brief, that reasons that he's using to accept African-American jurors, to accept Caucasian jurors aren't being applied to African-American jurors. Reasons to strike African-American jurors aren't being applied to Caucasian jurors. Let me go back and address a couple of the other, the preliminary points. The question of objection. Judge McKee, you said what else could Mr. Rogers do? And I would agree with that sentiment. I think that's right. There's a six-page colloquy. There's a six-page dialogue between Rogers and the judge and Mr. Carpenter. And Rogers at least four or five times says, Judge, he's striking all the blacks. He's striking all the blacks with this panel. He's striking all the blacks. I can see. I can look at who's coming in and I can see what he's doing. He's striking all the blacks. He says that's wrong. He says he's not allowed to strike on the basis of race. He's not allowed to summarily do that. And the trial, he says, I want to make a record. I want the court's help to establish that these were black jurors who were being struck. And at each stage, the court refused. The judge says, I can't tell who's white and who's black just by looking at them. I'm not going to make that decision. I'm not going to help you get any records. I don't know that there are any records to get. Everything Rogers tried to do, the judge refused. And in the end, the judge says he can make peremptory challenges for any reason he wants. And that was the law at the time. That wasn't an incorrect ruling, but that was a ruling. There's something about this case that strikes me. After the affirmance by the Supreme Court of Pennsylvania, I gather that your client was in prison and the death penalty had been imposed, but then it wasn't carried out, obviously. And apparently he didn't do anything. He just sat there for about six years, and then he filed something. Is that right? That's correct. That was not uncommon at that time, Judge Greenberg. There were no statutes of limitations in either federal law or in state law at the time that required defendants to file PCRAs in any particular time after direct appeal. People on death row had very little access to legal information. They didn't have access particularly to lawyers. There wasn't anything like the federal defender does now or a resource center in Pennsylvania. That didn't come along until 1994 when there was some institutional basis of lawyers being there to assist death penalty prisoners. So death penalty prisoners were left, like Mr. Lark, were left pretty much to their own devices without any prods from the law that would require them to file in any faster time. Well, he did file it shortly after the McMahon tape was released. That's correct. In fact, the first PCRA was on appeal at the time the McMahon tape was released, and within a couple of months, PCRA counsel filed a motion in the Pennsylvania Supreme Court to remand so that he could raise those issues and have a hearing. And then when the court denied that within 30 days, he filed a second PCRA petition raising the Batson claim with the McMahon issues and asking for an evidentiary hearing. And his request was repeatedly denied, even though the Pennsylvania Supreme Court, unlike some of the other cases, the Pennsylvania Supreme Court actually found that at least in part, that second PCRA was timely, timely as to raising the McMahon tape because that was newly discovered evidence, and yet still denied an evidentiary hearing on the Batson claim. The question of whether Judge Padova erred in granting an evidentiary hearing in this case was definitively answered last week in the case of Morris v. Horn that I cited in the 28-J letter that I sent in the court last week. And in Morris v. Horn, the prosecution, the Commonwealth, made very similar arguments to what they've made in this case. And Judge Hardiman, writing for the unanimous panel, wrote, where is here a state court gives no reason for denying a petitioner's hearing request other than his failure to comply with the subsequently invalidated state statute of limitations, we cannot say that the petitioner was not diligent for purposes of 2255E2. So Morris was also a case where an issue was raised in the second post-conviction petition. The state court found it untimely. That was an inadequate bar under Bronstein and all the other cases this court's previously decided. And Morris says, so long as he raised that in the time of relaxed waiver, which is what Mr. Lark did, and Mr. Lark had that new evidence as well, and so long as he asked for an evidentiary hearing, he has been reasonably diligent. And so it was proper for Judge Padova to hold the evidentiary hearing. So I think, to just sum up, I think it was proper to hold the evidentiary hearing. Mr. Rogers could not have done more other than to utter some kind of magic words in terms of his objection at trial. And Judge Padova's ruling was correct. He understood the law. He sets out the law properly. And the record supports his finding that there's facts in violation. Mr. Leib, are you asking us to affirm on the basis that Judge Padova made a proper determination at stage two, or are you asking us to go to stage three and weigh the evidence that we see and to affirm on that basis? I'm suggesting, Judge Sirica, that Judge Padova made a proper determination at stage two that there were no reasons given as to three, that he properly recognized that the burden of proof was still on the defendant, and he properly found that, based on the record before him, coupled with the stage two failure, that Mr. Locke was entitled to relief. I would say that if you have to get to a more comprehensive, if you think that there should have been a more comprehensive stage three review, then perhaps it would be better to remand to Judge Padova to do that. But I don't think in this case you need to get to that question of whether there should have been a more comprehensive stage three review. I think one of the things that's different here is the normal question we ask in step three is were the reasons given by the Commonwealth pretextual. That's the normal question in proving discrimination. You can't really ask that question where the Commonwealth hasn't given any reasons at all. It's not a question of pretext anymore. So Judge Padova took what he had and found that a Batson violation had been established. I think it can be affirmed for that reason. But if a reviewing court thinks that reasons were given, for the sake of argument let's say that maybe they're not necessarily compelling, but that they are reasons, does that automatically mean that you go to step three? If you think that reasons were given as to those three jurors, yeah, then you should go to step three. And I do agree with Mr. Dolginus that even without the reasons, you have to reach the question of did Lark satisfy the burden of proof. The burden of proof doesn't shift. So going back to stage three and having Lark satisfy the burden of proof are very similar questions. I think Judge Padova knew that. I think that this Court certainly can reach the stage three question itself, but I think the better practice would be, since Judge Padova is the one who heard Mr. Carpenter, the better practice would be to remand. But certainly if this Court feels the record is sufficient for itself to reach that question, then this Court can. You said that stage three is whether or not the defendant, the petitioner, can show that the stage two explanation was pretextual. But that's not exactly right, isn't it, that they have to show there was purposeful discrimination? That's right, Judge Carpenter. That's the same thing? What I meant to say, if I misspoke, I apologize. What I meant to say is the usual question we face in stage three in determining whether we've shown purposeful discrimination goes to the pretext of the reasons. But you are certainly correct that the ultimate question is, did the defendant show purposeful discrimination? It strikes me in this case, and obviously whatever we write we can't put a footnote saying that we only have me in this opinion to apply to the case of Lockheed Beard. In this case, there are some things there, and you just mentioned them in your suggestion of similar factors and whether or not comparing black and white jurors or comparing dissimilar scenarios. You mentioned the young lady who was at Emory and how her situation was similar to some whites who were accepted. That kind of analysis, conceivably in another case, where we're only fighting about one juror and not three or four, you don't have the quip on the record by the DA and you don't have the kind of statistical anomaly that we have in this case, where the statistics really don't show anything. But it does seem like the best way to solve it is to get to step three and for the hearing to be in front of the district court where the attorneys can make these kinds of subtle arguments between white jurors that were accepted and black jurors that were struck. I guess we can come through the record and do it, but it would be a lot better having the aid of counsel in a competitive hearing scenario before a district court to allow those kinds of comparisons, if you made the kind of comparisons that Mr. Delginess suggests here, undermine the finding of Batson violation, in which you're saying confirm the finding of a Batson violation. In another case, that could be really crucial. In another case, it could be. And that's why we certainly have no objection to a remand if the court thinks it's necessary and that it probably is in most cases the better practice, but whether it's necessary in this case is the question that your honors will decide. Thank you very much for your time. I appreciate it. Mr. Delginess, did I get it right that time? You did. Okay, I'm going to stop. I'm just going to call you counsel from now on. All right. That's better than hey, you. Or yo. I think I have four points. Number one, Mr. Lev says that the district court properly engaged didn't make sort of an automatic step two determination. That's not how I read it. I'm quoting here from the opinion, where a state fails to meet its Batson duty of production at step two, the analysis ends with a finding of the existence of a Batson violation. As I understand that, I mean, it is an automatic. You don't meet step two, you lose. And that's clearly wrong. Number two, Mr. Lev was talking about as evidence of discrimination that Mr. Carpenter did not deny using individual strikes against African Americans, but that's because that wasn't the objection. Mr. Rogers said, I think he's striking all blacks. And Mr. Carpenter responded, no, I'm not, essentially. So, in other words, if you bend over backwards to say, well, that was a Batson objection, which, again, we disagree with, I don't think you can go even further and say Mr. Carpenter's response was somehow evidence of discrimination because he didn't actually respond to an argument that was not made. That's number two. Number three, with respect to the, this is very brief, with respect to the other culture evidence, the McMahon tape, et cetera, I agree with Your Honor that in Bond and Abu Jamal, this Court has been careful to say that those types of things don't move the bar from no prima facie case to prima facie case. And more than that, I think, if you read the opinions, they're quite clear that they don't move the bar much at all. With respect to the McMahon tape specifically, remember that the one part of this claim that was decided by the State Court was then the McMahon tape in this case involving a different prosecutor, involving a trial that happened before Batson, was not enough to revive a claim that had not been made or had been waived. I think that is the one piece of all this that actually gets EDPA review. So I think it's not fair game to go down to the District Court and start arguing about that more. And start arguing about what? And start arguing about the McMahon tape when the State Court has already held that it doesn't revive the claim. You know, if you get a remand, you're going to have a tough time, I think, because if the court felt that, well, we have a reason, and we say, well, it was enough of a reason, I don't know, you know, you've got to now convince the judge that there was no discrimination. Well, no, wait a second. It's the other way around. The petitioner has to.  These are the facts. I don't disagree with you. And, you know, as a practical matter, Judge Greenberg, one reason why I think a remand is not the best solution in this case is because the District Court reached its result by using an improper analysis and, you know, asking somebody to decide the question of discrimination once they've already attempted to do so and sort of done so, and then you say the process was wrong. I'm not sure. You know, I respect Judge Padova a lot. I don't want to say that we wouldn't get a fair hearing, but it would be perhaps more of an uphill climb than the law mandates. If one last point, and this goes to the evidentiary hearing, again, one of the threshold issues as to whether the evidentiary hearing should have been held in the first place. Mr. Lev cited Morris v. Horn for the proposition that the diligence standard of 2254E2, which prohibits an evidentiary hearing in federal court where the petitioner has failed to develop the record in state court, that's a diligence standard. In Morris v. Horn, it's true that the court said, well, if the state bar that was eventually used to bar the claim is inadequate, we're not going to go further and ask more about diligence. On the other hand, this court has held in other cases, in Lewis and in Taylor, that issues that were raised in subsequently barred PCRA proceedings, where those bars were found inadequate, they were barred by the diligence standard. In other words, whether the PCRA time bar is inadequate doesn't ultimately decide the diligence question. It's especially true in a Batson case, because unlike Morris v. Horn, which was a conflict of interest claim where all of the facts took place outside the courtroom, here you're talking about, you know, the jurors are there, the judges are there, the lawyers are there. There is a forum to raise the Batson claim. There is a forum to develop the record. And ultimately, if you don't, it's a common-sense definition of diligence, that failure to raise it there and failure to raise it on direct appeal and failure to raise it in the first PCRA and failure to raise it in the PCRA appeal has some impact on diligence. If there are no further questions, thank you. Thank you. I really want to commend both counsel for a very fine argument, both the quality of your argument and the demeanor of the argument. We really don't see enough of it, especially in these kinds of capital cases. And it's always a pleasure to see each of you, and it's certainly been a pleasure listening to both of you. But I really do want to commend it. It's been very helpful. And I wish we'd seen more of the kind of argument we got here today. I doubt we will, but I wish we had.  I appreciated that comment and the argument. And I thought that whatever sarcasm there may have been in the trial court years ago certainly wasn't there today. This was a real argument by real lawyers. It really was, which may mean that neither of you will become judges. Since the subject of sarcasm in trial court was not a judge. Thank you very much.